## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JASON SMITH,

Plaintiff,

v.

CHIEF JUDGE OF THE CIRCUIT
COURT OF COOK COUNTY et al,

Defendants.

Case No. 17-CV-08341

Judge Mary M. Rowland

## MEMORANDUM OPINION & ORDER

Plaintiff Jason Smith ("Smith") brings this lawsuit against the Office of the Chief Judge of the Circuit Court of Cook County ("OCJ"), and three of his supervisors in the Juvenile Probation Department of that court: Director Avik Das ("Das"), Director of Human Resources William Patterson ("Patterson"), and Deputy Chief Dennis Alexander ("Alexander"). Smith alleges that the OCJ discriminated against him on the basis of his race or color in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), and retaliated against him for exercising his protected rights.[1] He also asserts that Das, Patterson, and Alexander discriminated against him on the basis of his race or color in violation of § 1981 and § 1983,[2] and retaliated against

---

[1] The Court previously dismissed Smith's claims that the OCJ discriminated against him on the basis of sex and national origin and Smith's claims filed against the OCJ pursuant to §§ 1981 and 1983. (Dkt. 35, 3–6). The Court also dismissed Title VII claims against the three individual Defendants. *Id.*

[2] Smith's § 1981 claims against the individual defendants are construed to have been filed under § 1983. *Campbell v. Forest Pres. Dist. of Cook Cty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014) ("§ 1983 remains the exclusive remedy for violations of § 1981 committed by state actors."); *McKinney v. Office of Sheriff of Whitley Cty.*, No. 15-CV-00079, 2018 WL 2296750, at *2 (N.D. Ind. May 21, 2018)

him for exercising his protected rights. Defendants have filed two motions for summary judgment. (Dkts. 128 & 132). For the reasons stated below, both of the Defendants' motions are granted.

## BACKGROUND

The Court views the facts in the light most favorable to Smith, the non-moving party, when reviewing these motions for summary judgment.[3] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Smith alleges he was denied a compressed workweek, consisting of four ten-hour days and extending from Monday through Thursday. Smith asserts this denial was based on his race because he is black and a white colleague was granted a similar schedule. He also alleges that this denial was an act of retaliation in response to Smith's protests against past acts of racial discrimination in the workplace.

Smith worked for the Circuit Court of Cook County as a Juvenile Probation Officer from 2003 through 2018 and was under the direct supervision of Benny Blair

---

("government employees sued in their individual capacities are state actors for purposes of Section 1981, and such claims must be brought under Section 1983").

[3] Defendants argue that Smith has not complied with Local Rule 56.1 by filing more than 40 statements of fact, failing to support his facts with relevant evidence, failing to double-space his briefs, and submitting briefs with inappropriate margins. (Dkt. 178, 2; Dkt. 186, 2). Courts construe *pro se* pleadings liberally, *see Ambrose v. Roeckeman*, 749 F.3d 615, 618 (7th Cir. 2014), but a litigant's *pro se* status does not excuse him from complying with the federal and local procedural rules. *See Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009). That said, application of Local Rule 56.1 is within the Court's discretion, *see Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005). Smith's formatting errors are excused. Because the Court would have allowed Smith to file additional statements of fact the facts in excess of 40 will be considered. However, where Smith failed to support his denials with specific citations to relevant evidence in the record, the Court will deem the Defendants' facts admitted.

("Blair") from 2004 onwards.[4] (Dkt. 153, 2). He was by all accounts a good employee, receiving performance bonuses and positive reviews from his supervisors both before and after he was denied his preferred schedule. (Dkt. 175, Ex. 2; Dkt. 169, ¶¶ 35–36). While a full-time employee, Smith began working towards his master's degree in 2007, completing it in 2009. (Dkt. 175, Ex. 2, 25). He also worked part-time as a police officer with the Berwyn Police Department from 2006 onwards, usually on Friday and Saturday nights. (Dkt. 175, Ex. 2, 63).

Smith was an active member of his union, AFSCME, Local 3477. (Dkt. 169, ¶ 7). He served as a union steward from 2010 through 2012, as Vice President of his local chapter from 2012 to 2014, and as President from 2014 until 2016. (Dkt. 169, ¶ 8). In his capacity as a union representative, Smith made frequent complaints about racial discrimination in the workplace from about 2012 onwards. (Dkt. 175, Ex. 2, 106–07). This involved writing letters, requesting data from management, speaking to management, filing grievances on behalf of other employees, bringing unfair labor practice charges to the Illinois Labor Relations Board ("ILRB"), and helping other employees file charges to the Illinois Department of Human Rights ("IDHR") or the Equal Employment Opportunity Commission ("EEOC"). (Dkt. 175, Ex. 2, 106–07, 116; Dkt. 25, Ex. L). He was also a potential witness in two federal discrimination lawsuits which were initiated sometime in 2014. (Dkt. 175, Ex. 2, 109, 134). On July 15, 2016, Smith signed an affidavit in *Montenegro v. Chief Judge Circuit Court of*

---

[4] Factual information in this section will be cited using the docket number, followed by an exhibit number and a page or paragraph number.

*Cook County*, 14-CV-03416. (Dkt. 25, Ex. J). Smith also provided information to the IDHR in support of Probation Officer Kaletha Seay's charge of racial discrimination (2014-CF-2907) sometime after October 14, 2014 and assisted many other employees in preparing similar charges. (Dkt. 25, Ex. O). Some of the racially discriminatory behavior that Smith reported was the use of a racial slur by Das (who was reading aloud from a document at the time), racial disparities in staff discipline, and an unwillingness to hire and promote African-American candidates. (Dkt. 25, Exs. M, Q).

As an employee in a unionized office, Smith's employment conditions were the subject of a collective bargaining agreement ("CBA") which stated that "the regular work day for a full time employee shall be eight (8) hours each day [and] run Monday through Friday." (Dkt. 153, 3). There were two shifts available to employees (8:30 AM to 4:30 PM, or 9:00 AM to 5:00 PM) and Smith worked the earlier shift, although at times he would also work in the evenings or on weekends in order to accommodate the parents of the juvenile probationers he supervised. (Dkt. 153, 3).

The 2012 CBA provided for "Flex Time" schedules as follows: "[r]equests by employees for flextime schedules shall be granted where practicable to do so. The scheduling of flextime shall be by mutual arrangement between the employee and his/her supervisor." (Dkt. 25, Ex. P). The 2016 CBA altered the Flex Time provisions, requiring that an employee have a "mutual agreement" with his/her direct supervisor and the approval of both the Deputy Chief and the Director of Juvenile Probation, who would review schedule modifications with an eye towards the "operational needs

and Department priorities."[5] (Dkt. 175, Ex. E, 2). Another schedule variation described in the 2016 CBA, the Adjusted Work schedule, consisted of 40 hours of per week, with "accrued time or zero time" contributing to that total. (Dkt. 175, Ex. E, 2). The purpose of an Adjusted Work schedule should, according to the 2016 CBA, be "medical, educational," or reflect the "short term family needs" of the employee. *Id.* The 2016 CBA also allowed for a Part-Time schedule of 20 hours per week, accompanied by a commensurate decrease in pay, conditioned upon the approval of an employee's supervisor, the Deputy Chief, and the Director, and in accordance with "operational needs and Department priorities." (Dkt. 175, Ex. E, 3). Separate from the alternative schedules in the 2016 CBA, the department also had a policy of granting an hour and a half of "educational credit" to employees who were pursuing their education. (Dkt. 175, Ex. 2, 178–80).

As a union representative, Smith was privy to certain information about the schedules of other employees. He was aware that in 2014 a white female colleague was permitted to work four days a week while she attended a social work master's program. (Dkt. 130, Ex. G, 12). She requested this accommodation (described as an

---

[5] It is not clear from the record whether the 2012 CBA or the 2016 CBA was in effect on July 27, 2016, when Smith requested a compressed schedule. (Dkt. 175, Ex. 2, 227). Smith argues it was the 2012 CBA. (Dkt. 175, Ex. 2, 222; Dkt. 155, Ex. 4). Unlike the 2016 CBA, the 2012 CBA only required approval from an employee's direct supervisor, not from the Deputy Chief and the Director. (Dkt. 175, Ex. 2, 230; Dkt. 25, Ex. P). The differences between the 2012 CBA and the 2016 CBA have no impact on the viability of Smith's claims. While an employer's failure to follow its own policies may have bearing on whether an employer's stated reasons for its actions were pretextual "the fact that Defendant did not follow its policy is not by itself evidence of any improper motive." *See Moore v. CN Transportation Ltd.*, No. 17-CV-6188, 2021 WL 111489, at n.13 (N.D. Ill. Jan. 12, 2021); *see also Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) ("So long as [Plaintiff's] sex did not influence [the] decision to fire her, that decision—even if made by misapplying firm policy—would not violate Title VII."). Even if the Defendants were violating the CBA, there is no evidence they were doing so in a discriminatory fashion.

Adjusted Work Schedule rather than a Flex Time schedule) on September 30, 2014. (Dkt. 175, Ex. 2, 193). She requested to work 11, 8.5, 8.5, 10.5 hours for four days, and to apply a 1.5-hour educational credit on the fifth day. (Dkt. 141, Ex. 2, 193–94). She only needed the adjusted schedule for eleven weeks, or the length of one school semester. *Id*. She reported to a different direct supervisor than Smith when she made this request. (Dkt. 169, ¶ 44). Her request was reviewed by a prior Deputy Chief named Irv Ashford, not by Deputy Chief Alexander (who reviewed Smith's request).[6] (Dkt. 175, Ex. 2, 203; Dkt. 169, ¶ 44).

In the spring of 2016 Smith wanted to study for the LSAT because he intended to apply to law school. He also wanted to take a Spanish class so as to better serve the Spanish-speaking juveniles he supervised and become eligible for a small pay increase as a bilingual employee. (Dkt. 153, 7; Dkt. 175, Ex. 2, 75). In June of 2016, he requested to work four ten-hour days (8:30 AM to 6:30 PM) a week (Monday through Thursday) to allow him to study or take classes on Fridays. (Dkt. 153, 6). His immediate supervisor, Benny Blair, verbally approved this request. (Dkt. 175, Ex. 2, 75). Smith next asked Deputy Chief Alexander to approve this compressed schedule, but Alexander believed that he did not have the authority to do so. (Dkt. 169, ¶¶ 26–27). Alexander asked Smith to submit an Adjusted Work Schedule request to Human Resources. (Dkt. 175, Ex. 2, 83–87; Dkt. 169, ¶ 28)). Smith filled out that form on or

---

[6] In contrast, another white employee was denied a four-day schedule in June of 2016 when her supervisors determined that the "volume of intake and extensive witness [*sic*] requires all staff to work a full time schedule, [and] [t]he needs of our operation and nature of our work does not support this alternative schedule." (Dkt. 169, 59–60).

about June 27, 2016. (Dkt. 175, Ex. 2, 100). He did not initially include his reasons for wanting a compressed schedule on the form, but testified that he provided those reasons to Patterson upon request. (Dkt. 169, ¶ 23). Smith asked that he be granted his preferred schedule "for as long as is mutually agreeable between the supervisor and the employee." (Dkt. 169, ¶ 22).

On July 8, 2016, Director Das informed Deputy Chief Alexander that Alexander did in fact have the authority to approve or deny Smith's request. Deputy Chief Alexander sent Smith a letter on July 14, 2016, denying his request for a compressed schedule.[7] (Dkt. 175, Ex. 2, 269; Dkt. 25, Ex. G). In that letter Alexander advised Smith that "[i]t is the expectation that our division operates five days a week. Adjusted schedule request [*sic*] are currently being considered for variations of adjusted daily schedules. As a result of the expectation of a five day work week by the minors we serve, the judiciary and fellow colleagues, the Chicago West Division operates Monday through Friday; therefore I am denying your request. If you choose to continue to pursue a four-day work week schedule, you may resubmit your request for consideration of a reduced schedule or part-time employment." (Dkt. 25, Ex. G; Dkt. 175, Ex. 2, 266). Smith did not request a reduced or part-time schedule, which he understood to mean less than a 40-hour work week, accompanied by a corresponding salary reduction. (Dkt. 175, Ex. 2, 175).

Smith filed a grievance requesting a compressed workweek in the form of a Flex Time (rather than Adjusted) Schedule, which he believed he was owed under the

---

[7] Alexander is also a black man. (Dkt. 169, ¶ 26).

2012 CBA. (Dkt. 175, Ex. 2, 208–11). His grievance indicated that the only forms being made available to employees were tailored to Adjusted, rather than Flex Time, schedules. (Dkt. 175, Ex. 2, 97–98). According to Smith, his grievance was denied because he had not provided enough information about why he wanted his schedule changed. (Dkt. 175, Ex. 2, 11). In the written grievance denial that was sent to Smith on November 2, 2016, Counsel to the OCJ, Kate Galbraith ("Galbraith") wrote that Smith's managers had not violated the CBA by denying him his desired schedule. (Dkt. 25, Ex. H). She cited various reasons, including (1) "establishing work schedules is a management right" not merely a direct supervisor's prerogative, (2) Smith's failure to "offer any reason for his flextime request," (3) the "operational feasib[ility]" of such a schedule given that court is in session Monday through Friday, and (4) the belief that "no officers have received approval to work a compressed 40-hour workweek." (Dkt. 25, Ex. H, 1–2). After Smith had appealed his grievance through every level of management, his union declined to bring it to arbitration. (Dkt. 25, 2). Smith unilaterally filed a charge with the ILRB, alleging that by denying Smith the compressed schedule he and his immediate supervisor had agreed upon, upper management was violating the CBA. (Dkt. 175, Ex. 2, 274). When the ILRB dismissed that charge, Smith elected not to pursue it further in court. (Dkt. 175, Ex. 2, 289).

On July 21, 2016, Smith filed a charge with the IDHR alleging retaliation. (Dkt. 25, Ex. A). On October 5, 2016, he mailed an addendum to the IDHR, naming additional defendants (Das and Alexander) and alleging discrimination on the basis of his race and color. (Dkt. 25, Ex. B). This letter was received by the IDHR on October

11, 2016, and the charge was finalized on November 9, 2016. (Dkt. 25, Ex. B). After participating in an IDHR factfinding conference in March of 2017, (Dkt. 25, Ex. C), Smith's charge was withdrawn on March 24, 2017 so that he could be issued a Right to Sue letter. (Dkt. 25, Ex. A). Smith filed this lawsuit on November 17, 2017. On February 15, 2018, he quit his job as a Juvenile Probation Officer.[8] (Dkt. 175, Ex. 2, 37).

## LEGAL STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323 (1986). After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted). "It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility

---

[8] Smith alleges that after he left the Juvenile Probation Department to accept a job with the City of Chicago, his former supervisors contacted the City and caused his termination. (Dkt. 172, 32; Dkt. 155, Ex. 69, 12). He did not raise these allegations in his IDHR charges, which predated the alleged retaliatory conduct. Smith agreed in his deposition that these allegations were not relevant to the case at bar. (Dkt. 175, Ex. 2, 176–77). Any claims based on this potentially retaliatory conduct are waived.

of identifying the evidence on which he relies." *Harney v. Speedway SuperAmerica*, LLC, 526 F.3d 1099, 1104 (7th Cir. 2008). Construing the evidence and facts supported by the record in favor of the non-moving party, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [their] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted).

## ANALYSIS

### I. Preliminary Matters

Before addressing the merits of Smith's case, the OCJ argues that Smith did not file his suit within ninety days of his receiving his right to sue letter, and that he failed to exhaust his administrative remedies as required by Title VII.

### A. Untimely Claims

The OCJ argues that Smith's claims "are untimely as he failed to file suit within requisite ninety (90) day time period." (Dkt. 39, 4). Plaintiff's Right to Sue letter was first issued on July 17, 2017 and sent to Smith via certified mail but was returned to sender as "unclaimed." (Dkt. 1, 9). A second letter was sent via certified mail on October 19, 2017, and this letter was claimed. (Dkt. 169, ¶ 68). Smith filed his law suit on November 17, 2017, four months after the first letter was sent, but only one month after the second letter was sent. The question facing the Court is whether the first letter started Smith's ninety-day clock, since "[t]he time limit is not flexible, even for pro se litigants, and a one-day delay is fatal." *Davis v. Browner*, 113 F. Supp. 2d 1223, 1225 (N.D. Ill. 2000)

The ninety-day period begins to run from the time a plaintiff receives actual notice, unless the plaintiff is at fault. *See St. Louis v. Alverno Coll,* 744 F.2d 1314, 1316–17 (7th Cir. 1984) (affirming dismissal of the plaintiff's complaint because he failed to inform the EEOC of a change in address and did not receive his Right to Sue letter). When "a right-to-sue letter is sent by certified mail, and the plaintiff fails to pick up the letter before the Post Office returns it to the EEOC, the actual notice rule does not apply unless the plaintiff produces facts explaining why he did not timely retrieve the letter." *Jones v. Motorola, Inc.*, No. 00-CV-6439, 2001 WL 864273, at *5 (N.D. Ill. July 30, 2001).

Smith states that he "never received any notices of certified mail in July of 2017 to notify that there was mail at the post office [. . .] There were no notices left at his address to notify him of 'unclaimed mail.'" (Dkt. 150, 10). When Smith inquired about the status of his letter by email on October 12, 2017 (within the ninety-day window), he was advised in a reply email that the letter had not yet been sent because an administrator was "waiting on EEOC to email me your paperwork." (Dkt. 155, Ex. 40, 1). Given these facts, Smith was not at fault for failing to retrieve his first letter, and he timely filed his claim.

### B. Exhaustion of Administrative Remedies

The OCJ next argues that summary judgment should be granted because Smith failed to exhaust his administrative remedies. Smith's IHRC charge only alleged "retaliation," not discrimination. (Dkt. 169, 64–66). However, in a subsequent letter to the IHRC dated October 4, 2016 and marked received on October 11, 2016,

Smith wrote that he was "submitting the following corrections to the form that was sent regarding my complaint." (Dkt. 155, Ex. 78). Those corrections included the addition of the allegation that "I was discriminated [*sic*] based on my race, color." *Id.* The finalized charge however, which Smith signed in November, did not mention discrimination.

Courts may determine that a plaintiff exhausted his administrative remedies with respect to an allegation contained in a complaint that was not raised in the EEOC charge if it describes the same conduct and implicates the same individuals as the charge. *See Huri v. Office of the Chief Judge of the Circuit Court of Cook County*, 804 F.3d 826, 832 (7th Cir. 2015). The Court concludes that Smith's charges of retaliation and discrimination concern the same course of conduct (the denial of a compressed schedule) and the same individuals (the named Defendants). The discrimination allegations were also "like or reasonably related" to the retaliation claim and could reasonably have been expected to grow out of an investigation of the allegations in the charge. *See Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003); *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). Therefore, Smith has exhausted his administrative remedies with respect to the discrimination claim as well as the retaliation claim.[9]

---

[9] The OCJ cites *Fantozzi v. Winston & Strawn LLP*, No. 11-CV-392, 2011 WL 3704930, at *4 (N.D. Ill. Aug. 17, 2011), where a *pro se* plaintiff's intake questionnaire referencing harassment and retaliation was not permitted to be used to supersede the plaintiff's charge alleging only race discrimination. The *Fantozzi* court was persuaded because nothing suggested the defendant was made aware of the allegations outside the discrimination allegations contained in the charge. In contrast, in this case, during the course of the IHRC's investigation into retaliation, the Defendants were made aware of Smith's discrimination allegations. See *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110–11 (7th Cir. 1992) (plaintiff's handwritten "EEOC Affidavit" submitted the same day as her EEOC charge was

## II. Discrimination Claims

Smith claims discrimination based on race and color against the three individual Defendants and the OCJ pursuant to § 1983 and Title VII, respectively. The Seventh Circuit uses the same standard to evaluate claims of discrimination under both statutes. *See Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 601 (7th Cir. 2020). Therefore, the Court will consider these claims together.

One familiar framework for analyzing discrimination claims is derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Smith argues that "strict application of the *McDonnell Douglas* burden shifting analysis is not warranted here" because of the "direct evidence of discrimination emanating from the decision makers at the root of the majority of challenged discriminatory acts, namely the OCJ and the individual defendants." (Dkt. 172, 4). Because it is not clear whether Smith is arguing for some modified application of the *McDonnell Douglas* framework or intends to argue based on the totality of the evidence pursuant to *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), the Court will analyze the evidence both ways. *See Purtue*, 963 F.3d at 602 ("plaintiff need not rely on the *McDonnell Douglas* method to carry that burden; she may well have other 'direct or circumstantial evidence that supports an inference of intentional discrimination.' [. . .] For example, plaintiffs commonly point to 'ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment.'").

---

incorporated into the charge); *Box v. A & P Tea Co.*, 772 F.2d 1372, 1375 (7th Cir. 1985) (handwritten additions to typed charge allowed).

A. *McDonnell Douglas* **Analysis**

Under the *McDonnell Douglas* framework, Smith must first establish that (1) he is a member of a protected class; (2) his performance met his employer's legitimate expectations; (3) despite this performance, he was subjected to an adverse employment action; and (4) his employer treated similarly situated employees outside of the protected class more favorably. *See Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018). If Smith can establish these four elements, the burden shifts to his employer to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007). At that point Smith may rebut the Defendants' purportedly legitimate purpose with evidence of pretext. *See Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551, 554 (7th Cir. 2011).

Defendants do not contest that Smith is a member of a protected class (black or African-American), and that his performance met his employers' legitimate expectations. Therefore, the Court will move directly to the third prong of the *McDonnell Douglas* analysis: whether Smith experienced an adverse employment action.

**1. Adverse Employment Actions**

The Seventh Circuit has explained that "[w]hile adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (citations omitted). An adverse employment action is typically "a

14

significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007). In other words, an adverse employment action must "materially alter the terms or conditions of employment," *Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012). The denial of Smith's request for a compressed schedule did not materially alter the terms or conditions of his employment. He continued to work the same shifts that he had been working for thirteen years. He also received the same salary and benefits including a subsequent performance bonus. (Dkt. 169, ¶¶ 35–37).

In general, the denial of a requested schedule change does not constitute an adverse employment action. *See Rabinovitz v. Pena*, 89 F.3d 482, 488–90 (7th Cir. 1996) (defendant's refusal to allow the plaintiff to alter his schedule was not an adverse employment action); *Sarver v. Staples the Office Superstore East, Inc.*, No. 12-CV-374-JMS-MJD, 2014 WL 1571221, at *7 (S.D. Ind. 2014) ("denial of [the employee's] flex time request was not an adverse employment action"); *Marcus v. West*, No. 99-CV-0261, 2002 WL 1263999, at *6, n.4 (N.D. Ill. June 3, 2002) (refusal to allow an employee to adjust her work schedule to attend night school was assumed not to be an adverse employment action); *Mingo v. Roadway Express, Inc.*, 135 F. Supp. 2d 884, 901 (N.D. Ill. 2001) (denial of a request to work seven days and take off seven days rather than working five days and taking off two days was not an adverse action as it did not affect plaintiff's "salary, title, rank, or benefits, nor would it have affected her responsibilities or the hours"). *See also Chaib v. Indiana*, 744 F.3d 974,

984 (7th Cir. 2014) (no adverse employment action when a correctional officer was denied a transfer to a lower security prison and saying that "just because Chaib subjectively considered a transfer to have been a more ideal fit or personally advantageous does not render its rejection adverse"). Smith has not shown that he suffered an adverse employment action.[10]

Smith argues he suffered an adverse employment action because by learning Spanish he could have qualified for a small pay raise. (Dkt. 151, 8). He compares his circumstances to cases where courts have found that a failure to train amounted to an adverse employment action. (Dkt. 151, 21–22, 26). *See also Bryson v. Chicago State Univ.*, 96 F.3d 912, 917 (7th Cir. 1996) (when the Plaintiff was stripped of certain committee appointments and titles, the Seventh Circuit held that '[d]epriving someone of the building blocks for [. . .] a promotion, if that is what a trier of fact thinks [the employer] did, is just as serious as depriving her of the job itself."); *see also Malozienc v. Pac. Rail Servs.*, 606 F. Supp. 2d 837, 864 (N.D. Ill. 2009) ("To be an actionable adverse employment action, a plaintiff alleging failure to train must offer evidence sufficient to demonstrate that preclusion from training resulted in a tangible, negative impact on the plaintiff's employment."). Such seemingly trivial denials may be actionable if they "impacted the plaintiffs' [. . .] opportunities for future advancement." *Nichols v. S. Illinois Univ. Edwardsville*, 510 F.3d 772, 781

---

[10] Smith also argues, unpersuasively, that he was "constructively discharged" when he was denied his preferred schedule. To establish a claim for "constructive discharge, 'a plaintiff needs to show that his working conditions were so intolerable that a reasonable person would have been compelled to resign.'" *Gilhooly v. UBS Sec., LLC*, 772 F. Supp. 2d 914, 917–18 (N.D. Ill. 2011) (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996)). Being forced to continue to work five days a week does not approach that standard.

(7th Cir. 2007). This argument falls short of demonstrating that the denial of Smith's preferred schedule was an adverse employment action. First, the "failure to train" cases like *Nichols* generally involve an outright denial of *necessary* training by *the employer itself*. Here, Smith's employer did not deny him training to which all employees are entitled as a matter of course. In addition, this was not a case in which Smith's employers deprived him of "building blocks for a promotion" like in *Bryson*. He had not enrolled in any classes when he made the request for a compressed schedule, nor did he share information about any particular classes with the Defendants when he first made his request. Finally, Smith completed a master's degree while working a Monday through Friday schedule. He also worked as a police officer in another jurisdiction on the weekends. It strains credulity to call the denial of Smith's preferred schedule a denial of the opportunity for future advancement. So, while denial of education or training can constitute an adverse employment action, this is not one of those cases. The Court finds that Smith was not subjected to an adverse employment action when he was denied his preferred schedule.

### 2. Similarly Situated Employees

Because Smith has failed to establish an adverse employment action, the third element of his prima facie case under the *McDonnell Douglas* framework, the Court need not reach the question of whether he demonstrated that similarly situated employees were treated more favorably.

17

## B. *Ortiz* Analysis

The Court now assesses all the evidence to determine whether a "reasonable factfinder could conclude that racial discrimination caused an adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Smith's claim ultimately fails to satisfy this analysis for the same reason it failed to satisfy the *McDonnel Douglas* analysis: he did not suffer an adverse employment action. Setting aside this shortcoming, Smith has not presented enough evidence for a reasonable factfinder to determine that racial discrimination was the reason he was denied a compressed schedule. In 2016 no other employee in the department was working the schedule Smith requested. At one point, two years prior, a white female co-worker had been granted a similar schedule, but under very different circumstances. She was already enrolled in a degree-conferring program, whereas Smith was only contemplating studying for the LSAT and taking a Spanish class. She requested her compressed schedule for a finite period of time, eleven weeks. Smith requested his compressed schedule for an indefinite period of time. The white co-worker and Smith had different supervisors, and they made their requests two years apart. While the operational needs of the department at the time of that colleague's request in 2014 seemingly made a compressed schedule feasible, that does not mean it would have been feasible to grant Smith a similar schedule in 2016. No reasonable jury could conclude, based on this evidence, that the denial of Smith's preferred schedule was caused by racial discrimination.[11]

---

[11] In addition, a white employee was denied a compressed four-day schedule the same month as Smith, in June of 2016, when her supervisors determined that "after thorough assessment of the

### III. Retaliation Claims

The Court next considers Smith's retaliation claims against the individual Defendants and the OCJ. To make out a retaliation claim against the OCJ under Title VII, Smith must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016). The Seventh Circuit has held that "retaliation also is a cognizable claim under § 1981," and Smith asserts his retaliation claim against the individual Defendants pursuant to this statute. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 887 (7th Cir. 2016); *see also Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 401–02 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008) ("Congress noted 'that the remedies available to the individual under Title VII are co-extensive with the indiv[i]dual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and that the two procedures augment each other and are not mutually exclusive."); *Edmond v. City of Chicago*, No. 17-CV-04858, 2018 WL 5994929, at *8 (N.D. Ill. Nov. 15, 2018) (noting that § 1981 permits retaliation suits and commenting that "[a]s an employment discrimination claim under § 1981 against City employees in their individual capacities, [the retaliation count] straddles the line between §§ 1981 and 1983."). The elements of a § 1981 retaliation claim are the same as those of a Title

---

operational needs of the Division" the "volume of intake and extensive witness [*sic*] requires all staff to work a full time schedule, [and] [t]he needs of our operation and nature of our work does not support this alternative schedule." (Dkt. 169, 59–60).

VII retaliation claim. *See Humphries*, 474 F.3d at 403. Because these two analyses are identical, the Court considers them together.

The OCJ concedes that Smith engaged in statutorily protected behavior, but disputes whether Smith suffered a materially adverse action and whether he has presented evidence of causality. (Dkt. 139, 12). The individual Defendants make similar arguments. (Dkt. 129, 10–12).

### A. Materially Adverse Action

At the outset, we must distinguish between an "adverse employment action," in the discrimination context and a "*materially* adverse action" in a retaliation claim. *See Aviles v. Cornell Forge Co.*, 183 F.3d 598, 605–06 (7th Cir.1999) ("We do not mean to suggest [. . .] that retaliation, to be actionable under Title VII (or other statutes), has to involve an adverse employment action. It does not."); *see also Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 745–46 (7th Cir. 2002) ("it is obvious that effective retaliation against employment discrimination need not take the form of a job action").

An adverse employment action must "materially alter the terms or conditions of employment," *Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012), and is usually of the same magnitude as "hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007). A *materially* adverse action, by contrast, is defined by the Supreme Court as an action that "a reasonable employee would have found [. . .] materially adverse, which in this context means it

well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68, (2006) (internal quotations omitted).

Although the burden is lower for Smith in the retaliation context, he again fails to meet it. The denial of Smith's preferred schedule did not create an "injury or harm." Rather, it failed to produce a perk. Therefore, Smith suffered no "quantitative or qualitative change in the terms or conditions of employment." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003) (affirming summary judgment on a retaliation claim because the denial of a benefit "and the enforcement of a pre-existing rule" is not a materially adverse action). Generally, the denial of a preferred schedule does not constitute a materially adverse action. *See, for example, Clemmer v. Office of Chief Judge of Circuit Court of Cook Cty. & State of Illinois*, No. 06-CV-3361, 2008 WL 5100859, at *7 (N.D. Ill. Dec. 2, 2008) ("[T]he alleged acts of retaliation regarding [Plaintiff's] schedule were not significant enough to deter a reasonable employee from filing a discrimination charge" [including] "not giving her the schedule she preferred,").

### B. Causal Connection

Having determined that Smith did not suffer a materially adverse action, the Court need not reach the issue of whether he has demonstrated a causal connection between his protected activities and the Defendants' allegedly retaliatory denial of his preferred schedule.

## IV. Legitimate Reason for Denial of Preferred Schedule

Smith has not made out the elements of discrimination or retaliation viewing the evidence as a whole. Therefore, the Defendants do not have the burden to provide a legitimate, non-discriminatory and non-retaliatory reason for their conduct.[12] That said, because they have provided such a reason in the alternative, the Court considers it. Namely, Defendants argue that because the juvenile justice system operated Monday through Friday, the operational needs of the Juvenile Probation Department required that Juvenile Probation Officers be available Monday through Friday. This is a valid reason, and Smith's employers have consistently asserted it, first in the denial letter issued by Alexander, (Dkt. 25, Ex. G; Dkt. 175, Ex. 2, 266), next in the grievance denial issued by Galbraith, (Dkt. 25, Ex. H), and finally in multiple pleadings and briefs. If he had made out a prima facie case of discrimination or retaliation, Smith would therefore need to demonstrate that this reason was pretextual, by showing either that this reason was "not credible," "had no basis in fact, [was] insufficient to motivate [the denial of his preferred schedule], or did not actually motivate [that denial]." *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 465 (7th Cir. 2014) (citation omitted).

Smith has not brought forward any evidence that would allow a jury to conclude that this justification was pretextual. The CBA makes it clear that employees are expected to work Monday through Friday, eight hours a day, during normal working hours. This schedule is subject to limited exceptions. Smith claims

---

[12] For this reason, the Court need not reach the issue of qualified immunity, which was raised by the individual Defendants.

that his immediate supervisor's verbal approval of a compressed schedule demonstrates that it was operationally feasible, but it is not surprising that upper management might, with the benefit of a bird's eye view of the department, feel otherwise. And although operational constraints did not bar Smith's white co-worker from working a compressed schedule for eleven weeks in 2014, by 2016 the needs of the department had changed. In fact, the Defendants argue (and Smith does not contest) that another white, female employee's request for a reduced schedule was denied in June of 2016 because "after thorough assessment of the operational needs of the Division" and the "volume of intake and extensive witness [*sic*] requires all staff to work a full time schedule" and "[t]he needs of our operation and nature of our work does not support this alternative schedule." (Dkt. 169, ¶¶ 59–60).

## **CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment (Dkts. 128 & 132) are granted. The Clerk is directed to enter judgment in Defendants' favor and against Plaintiff and terminate the case.

E N T E R :

Dated: February 26, 2021

_____
MARY M. ROWLAND
United States District Judge

23